W. G. WILLIAMS et al. *v.* EMILY JOHNSON et al.

*Fraudulent Judgment, sale thereunder—Unauthorized Appearance of Attorney—Rights of Purchaser without Notice of Fraud—Inadequacy of Price.*

1. Attorneys and Solicitors are officers of the Courts, expressly empowered to represent litigants, and parties about to acquire rights under the judgments of Courts are not bound to inquire into the authority of the attorneys who profess to represent the plaintiffs or petitioners; and where such rights have been acquired by one who had no notice of the lack of authority on the part of an attorney who professed to represent the owners in a proceeding for the sale of land, no evidence tending to disprove the existence of such authority ought to be admitted to overthrow the rights so acquired.

2. A purchaser at an execution sale, a stranger to and having no notice of any irregularity or fraud in the judgment under which he buys, has only to inquire if the Court from which the execution issued had jurisdiction of the parties and the subject-matter.

3. While creditors of an execution debtor may use inadequacy of price bid as an evidence of fraud and collusion between the purchaser and the debtor, the latter cannot make it the ground of contesting the title of the purchaser at an execution sale against him.

4. In an action to recover land and to set aside as fraudulent a judgment under which it had been sold it appeared that a widow, the mother of plaintiffs, had procured an *ex-parte* proceeding to be brought in the name of herself and children for the sale of the land in which she had dower and which she had contracted to sell and have conveyed by good title to the defendant or one under whom the latter claimed. The proceedings were not conducted to a decree for sale, but a judgment for court costs was taken therein against the petitioners, and the land was sold under execution issued thereon, and defendant became a purchaser at an insignificant price. The plaintiffs (heirs of the decedent) testified that they were not cognizant of the proceedings, and that the attorney who conducted the same for their mother had no authority to represent them, but there was no evidence that the defendant (the purchaser) knew that the attorney had no such authority : *Held*, that the facts that defendant was distantly connected with the widow (mother of plaintiffs) and occupied the *locus* as a renter for two years and during the time when the *ex-parte* petition was filed, and that before she purchased at the execution sale she held the land under and had possession of deeds which contained recitals showing that the widow had no authority to sell the fee, were not evidence from which the jury might infer that the defendant had notice of the fraudulent purpose and character of the *ex-parte* proceedings in which the judgment for costs, under which she now claims, was rendered.

CLARK, J., dissenting.

CIVIL ACTION, tried before *Connor, J.,* and a jury, at April Term, 1892, of WAKE Superior Court, the object being to set aside a judgment as fraudulent and to recover the land sold under execution issued thereon.

The facts necessary to an understanding of the decision of the Court are sufficiently stated in the opinion of Associate Justice BURWELL.

There was a verdict for plaintiffs, and from the judgment thereon defendants appealed.

*Messrs. George H. Snow* and *Battle & Mordecai,* for plaintiffs.

*Messrs. Batchelor & Devereux* and *Armistead Jones,* for defendants (appellants).

BURWELL, J.: The lot of land in controversy in this action was owned at the time of his death, in 1851, by S. W. Williams, to whose widow, Polly Williams, it was assigned as dower. She died in 1886. His heirs at law were his six children, three of whom, to-wit, W. Gaston Williams, Frank N. Williams and Mary J. Smith, are plaintiffs, each claiming one-sixth part of said lot. The children of a daughter, who died in 1878, and who was the wife of the plaintiff E. Jefferson Smith, are also plaintiffs and claim one-sixth part of said lot as heirs of their mother. The other two children of S. W. Williams are not parties to this action.

It is alleged in the complaint that the defendants hold said lot under the widow, who died as above stated in 1886, and also under a deed made to the defendant Emily Johnson by T. F. Lee, Sheriff of Wake County, dated April 26, 1873, he having sold the lot according to law on April 7, 1873, under an execution issued to him from the Superior Court of said county against the widow and children of S. W. Williams and also against I. J. Flowers, the husband of one of the daughters, and Jefferson Smith (one of the plaintiffs in this action), the husband of another daughter, for a bill of costs amounting to sixteen dollars and ten cents, the consideration expressed in said deed being eighteen dollars and five cents, bid by said defendant.

It is further alleged that the judgment for costs, upon which the said execution was issued, was irregular and fraudulent. And the plaintiffs demand judgment, first, that the said judgment "be set aside as to these plaintiffs

as being irregular and fraudulent"; second, that the deed from T. F. Lee, Sheriff, to Emily Johnson be delivered up for cancellation, and third, that they are the owners of the land described in the complaint.

The primary object of this action is, therefore, to have a judgment rendered against the plaintiffs in the Superior Court of Wake County in 1872 declared void because of fraud, and thus destroy the force and validity of defendant's title under the deed made to her by the Sheriff.

In the complaint first filed the plaintiffs only alleged their ownership of the lot in controversy, and that defendants unlawfully withheld the same from them and demanded possession thereof. The amended complaint changes the object of their suit to that above stated, their learned counsel thus conceding, as it seems, that they cannot oust the defendant from the land until they have first had vacated and set aside the judgment, execution and Sheriff's deed thereunder, which constitute, as we think, the defendant's only muniment of title.

Upon the evidence adduced and under the instructions of his Honor, the jury have found that this judgment against the plaintiffs was procured by the fraud of the widow, the life tenant, and that the defendant Emily Johnson had notice of this fraud when she bought the land at the execution sale made under said judgment; and because of this fraud and defendant's notice thereof it was adjudged that the judgment, execution and deed were void.

Upon the trial the counsel for the defendants contended that there was no evidence that their clients had any notice of the alleged fraudulent conduct of the widow, and that the evidence offered to establish that fraud was incompetent against them.

His Honor decided that the evidence offered to establish the alleged fraud was competent against the defendants,

and that there was evidence from which the jury might infer that defendants had notice of that fraud, and he so instructed the jury.

In these respects we think he erred.

There seems to be little conflict in the testimony offered by the parties on the trial, and the conflict is about matter that appears to us immaterial.

It is alleged in the complaint and admitted in the answer that at Fall Term, 1863, of the Court of Equity of Wake County, an *ex-parte* petition was filed by the late Sion H. Rogers, a practicing attorney of that Court, in behalf of the widow and heirs of S. W. Williams (the husbands of the *femes covert* being also parties), asking that a sale of the lot here in controversy be made, in order that the fund arising from such sale might be re-invested in a tract of land to be held by the widow for life, and then to each of the other petitioners as tenants in common, according to their rights in the lot sold. This was accompanied by an affidavit of two persons that it was for the interest of all the parties that the sale should be made and the fund invested as proposed. No orders or decrees seem to have been made while the cause was pending in the Court of Equity, but it was transferred to the Superior Court in 1868, and was continued from term to term till Fall Term, 1872, when a judgment was entered against the petitioners for costs amounting to $16.10, and execution was issued and a sale was made to defendant Emily Johnson as heretofore stated. She was in possession of the premises at the time of the sale, and had been in possession since November, 1863, when she had purchased the lot at the price of $2,500 from one Overby, who had bought it from W. H. High on the 3d day of November, 1863. High had purchased it on the 2d day of August, 1863, from one Harris

Flowers, and the latter held it under the following contract:

" Whereas the undersigned have this day sold to Harris Flowers and his heirs a lot of ground near the city of Raleigh * * * for the sum of fourteen hundred dollars; and whereas, some of the parties interested are under age: Now, know ye, that the undersigned Polly Williams, David Williams and S. N. Williams bind themselves, their heirs, executors and administrators, to make to the said Harris Flowers and his heirs a good and indefeasible title. to the same, or cause to be made such title by procuring a decree of the Court of Equity securing said title, or by procuring the execution of a proper deed from the parties interested, whether of age now, or of non-age; and in default thereof we bind ourselves, our heirs, executors and administrators, in the full and just sum of fourteen hundred dollars, and all interest from this date, and all such costs as he may be put to by reason of a failure to have said title made as above obligated. In witness whereof," etc.

This contract was executed in July, 1863, and was registered soon after its execution, and the recitals in her deed were such as to give notice to her that those under whom she held claimed under this contract.

It was also proved that for two years prior to her purchase of the lot in 1863 the defendant Emily Johnson had occupied it as tenant of the widow, Polly Williams, to whom she was connected by marriage, her brother having married a sister of Polly Williams.

Such being the relation of the parties to one another and to the matter in controversy, the plaintiffs insist that they shall be permitted to prove that the petition in the Court of Equity of Wake County for the sale of the lot and the re-investment of the fund was filed by Sion H. Rogers at the instance and request of the widow, and that neither he nor

she had any authority from the plaintiffs to file that petition, and that they had never ratified their action—that they were indeed ignorant of the fact that such a petition had been filed, or that any judgment for costs had been entered against them, or that any sale had been made thereunder till shortly before the bringing of this action, and that this petition was filed by the widow without the knowledge or consent of the heirs, and this judgment for costs, that had not been earned, was entered, and this sale under execution was made to cheat and defraud the heirs of S. W. Williams of their reversion in this lot.

The charge of fraud brought at this late day by the plaintiffs against their mother is founded upon the idea not that she did directly any act to deprive them of their title, but that, without any authority from them, she employed a most respectable solicitor, able and faithful, to ask a court of equity to sell the lot and itself invest the proceeds in other real estate.

We deem it unnecessary to discuss the evidence that tends to prove or disprove this charge of fraud, for we find no testimony that in our opinion in any way goes to show that the defendant Emily Johnson knew that the solicitor who filed the petition was acting without authority from the clients he professed to represent, or that the widow was contriving to cheat and defraud her own children. The facts that she was distantly connected with the widow by marriage and that she and her husband had occupied the lot from 1861 to 1863 as her tenants go for nothing. The recitals in her deed pointing, as plaintiffs contend, to the contract made by the widow and set out above in full, seem to us rather an assurance that the proceeding to perfect the title through the intervention of a court of equity was properly instituted, and that all the parties to the peti-

WILLIAMS *v.* JOHNSON.

tion had come into that court and submitted themselves to its jurisdiction, than the contrary,

As the defendant had no notice that the Solicitor had no authority to represent the petitioners, it is *conclusively* presumed as to *her* that he did have such authority, and no evidence tending to disprove the existence of such authority should have been admitted to overthrow rights which she had acquired while ignorant of such want of authority.

Attorneys and Solicitors are officers of the Courts. They are expressly empowered to represent litigants, plaintiffs and defendants, and parties who are about to acquire rights under the judgments of Courts are not at all bound to inquire into the authority of the attorneys who profess to represent the plaintiffs or petitioners. It is said of such persons that they "come into court by their attorney"; it is not permitted to them to say that they did not so come when the rights of innocent third persons have intervened.

So far, then, as concerns the defendants, the Court of Equity of Wake County and its successor, the Superior Court, had jurisdiction of the persons named as petitioners in the petition for the sale of the lot, and, if it is conceded, as plaintiffs contend, that there was no decree for the sale of the lot, still a judgment against the petitioners for costs, not excepted to or appealed from, was binding upon them; for they were to all intents and purposes present in Court and subject to its orders and judgments made in that proceeding. Upon this judgment for costs, which the plaintiffs now say they did not owe, but to which they then, though in theory present in Court, offered no objection, an execution was issued and a sale was made. To that sale the defendant went in the person of her agent. She and the heirs were antagonists. Their interests required that they should pay off this judgment for costs, and thus save their reversionary interests from sale. Her interests demanded

that she should perfect her defective title at as little cost to herself as possible. She had a right to presume that the Sheriff had notified each one of the heirs of the sale, for the law (Acts 1868–'69, ch. 237, sec. 11) required him to do so, and he was liable for damages if, through his failure to so notify them, any loss came to them. Being a stranger to the judgment, all that she was required to ascertain was that an officer was making the sale and that he was empowered to do so by a Court of competent jurisdiction. *Burton* v. *Spiers*, 92 N. C., 503. She was not called upon to bid against herself, and, under the circumstances that surrounded her, she acquired by her bid and the deed made pursuant thereto a good title against the heirs of S. W. Williams named in the execution, and their heirs; for, having no notice of any irregularity or fraud in the judgment under which she bought, as we have seen, she had only to inquire if the Court from which the execution issued had jurisdiction of the parties and the subject-matter. *England* v. *Garner*, 90 N. C., 197, and the cases there cited.

And as she was, as we have seen, in no way connected with the alleged fraud, the smallness of the price at which the lot was bid off by her cannot affect her title. These plaintiffs cannot be heard to complain that their property, sold under an execution of which they had notice (and as to these defendants such notice is conclusively presumed), brought too little. In *Durant* v. *Crowell*, 97 N. C., 367, the inadequacy of the price bid by the defendant, and at which the sale was confirmed to her, was held to be a fact from which she should have inferred that the title of the party whose title she acquired was not free from equities of the plaintiffs, but no such contention was made as that she did not acquire for the small sum bid the title of the party whose interest in the land was offered for sale. Creditors of the execution debtor may use inadequacy of price bid as evidence of

fraud and collusion between the purchaser and the debtor, as in *Osborn* v. *Wilkes*, 108 N. C., 671, but no case can be found, we think, that sustains the plaintiffs in their contention that *they* can use the inadequacy of price to destroy the title of one who bought their land at execution sale.

Taking this view of the matter in controversy, we do not deem it necessary to consider *seriatim* all the exceptions taken by defendants. They are entitled to a new trial, and it is so ordered.                    New Trial Granted.

CLARK, J., dissenting : The land was sold under a judgment for costs rendered at Fall Term, 1872, in a proceeding which had been instituted in equity in 1863 by Polly Williams. It was bought by the defendant at the price of $18.05. The jury find that the said proceedings, including the judgment for costs at Fall Term, 1872, were procured by the fraud of Polly Williams ; that the defendant had notice of the fraud when she bought at the sale under the execution for costs in April, 1873 ; that none of the plaintiffs had notice of the rendition of such judgment ; that the guardian of those of the plaintiffs who were at that time minors did not employ counsel in said proceedings in equity, and none of these plaintiffs had knowledge of said proceedings being pending ; that the land was sold under the judgment for costs and not under a decree in said cause, and that two of the plaintiffs were *femes covert* when the judgment was entered. Upon these findings the plaintiffs were unquestionably entitled to recover. But it is contended that there was not evidence sufficient to go to a jury to show knowledge of fraud on the part of the defendant, and this is the principal point presented by the appeal.

As to Polly Williams, the evidence that she procured counsel to file a petition in the names of plaintiffs, some of whom were then adults and some minors, without their knowl-

edge and consent, and that these plaintiffs never heard of
the pendency of such proceedings or the judgment and sale
thereunder, is evidence of fraud on her part sufficient cer-
tainly to be submitted to the jury in connection with the
other testimony in the case, especially in view of the fur-
ther evidence that two years before the alleged proceeding
in equity was begun, Polly Williams had bought land (and
taken the deed in fee therefor to herself) with money received
by her from the sale by her of this land, for which she
attempted to obtain title to the purchaser (under whom the
defendant claims) by filing this proceeding to have it sold in
the name of the plaintiffs, used without their knowledge and
consent.  The contract by Polly Williams with Harris Flow-
ers for the sale to him shows on its face that she had no right
to convey the land.  This contract was not only referred to in
the *mesne* conveyances under which the defendant claims,
and, indeed, in the very deed to her, but the contract itself
was in the possession of defendant and was produced at
the trial.  She was living on the lot in 1861 as a tenant of
Polly Williams, and up to November, 1863, when she took
the deed for it.  She was related to Polly Williams, and
was fixed, as we have seen, with notice that this proceeding
was instituted to perfect a title out of these plaintiffs and that
the payment, by the recitals in the deeds under which she
claims, had been made, not to them, but to Polly Williams.
She knew also that no decree of sale had been made in
the cause, and she buys under an incidental judgment for
costs rendered, as the jury find, without knowledge on the
part of the plaintiffs of the proceedings, the judgment, or
sale, and buys a valuable tract of land without any consid-
eration moving from her to the true owners, nor indeed to
any one, beyond a trivial sum ($18.05) to pay costs.  All
these things taken together surely were sufficient evidence
to be submitted to a jury, from which a jury would be

authorized to draw an inference that the defendant had notice of the fraud perpetrated by Polly Williams on these plaintiffs. If so, the Judge properly submitted that issue to them.

Aside from this, the land certainly belonged to these plaintiffs, subject to the dower right of Polly Williams. The title has not been divested out of them by possession and the lapse of time, since Polly Williams did not die till 1886 ; nor has the title of the plaintiffs passed by any deed executed by them, and the jury find upon testimony that the title has not passed from them by virtue of any sale or decree made in any cause in court to which the plaintiffs were parties, or of which they had any notice. There was no estoppel, nor can the plaintiffs be affected by the judgment and sale for costs in an action to which they were not parties. They were entitled to their day in court. They have not had it. It is as old as the twelfth section of *Magna Charta*—indeed, far older—as old indeed as the first perception of the principles of natural justice—that " no man shall be disseized of his freehold or deprived of his life, liberty or property, except by the law of the land." This is incorporated in section 17 of Article I of the Constitution of North Carolina. One of the latest amendments to the Constitution of the United States (the fourteenth) provides in like manner: " Nor shall any State deprive any person of life, liberty or property without due process of law."

As just said, the plaintiffs once owned this land. They have not parted with it by conveyance. They have received nothing for it. There is no presumption or limitation against them by possession and lapse of time, nor are they in any way estopped. They have been deprived of the property upon the evidence adduced and according to the facts found by the jury, by a judgment, execution and sale in a cause to which they were not parties. They have not

had "due process of law," nor has there been any judgment against them according to "the law of the land."

It is true Courts lean, and properly, too, to upholding the integrity of legal proceedings. The plaintiffs having been named as parties to the legal proceedings in which the judgment for costs were rendered under which the land was sold, every presumption is that they were parties. But they have conclusively rebutted that presumption. The jury have found that they were not only not parties to the action, but never had any notice of the proceedings, or the judgment and sale.

Under these circumstances the plaintiffs should recover the land which has never legally passed from them. It is true that when counsel, who are able to respond in damages, represent parties to an action without their authority, the Court may uphold the title of an innocent purchaser at a sale under a decree in the cause, because then the owner of the land is not deprived of his property without compensation. *University* v. *Lassiter*, 83 N. C., 38. But here the counsel is dead, and the essential fact that the plaintiffs can get compensation for their property out of his estate does not appear. They have no remedy except to regain their own. Doubtless the counsel, misled by Polly Williams, honestly thought he represented these parties. Nor is this like the case where there is defective service upon a minor who appears by guardian, which defect is cured by statute. *The Code*, §387 ; *Harrison* v. *Harrison*, 106 N. C., 282. The proceeding here was not merely irregular; it was void.

It should be further noted that in *University* v. *Lassiter*, *supra*, the defendant had been served with process, and being thereby fixed with notice of all orders and decrees in the cause, he was bound by them, and it was his own negligence that he allowed an attorney to appear for him

whom he had not authorized. Here these plaintiffs were neither parties nor had any notice of the pendency of such proceeding.

In *Grantham* v. *Kennedy*, 91 N. C., 148, it is said that a judgment obtained by fraud is not, strictly speaking, a judgment of the Court. There is also another principle still older and fully as well recognized, that a judgment binds only parties and privies, and these plaintiffs were neither.

*Sumner* v. *Sessoms*, 94 N. C., 371, holds that where it appears from the record that a person was a party to an action, the legal presumption that he was a party is conclusive until removed by a direct, not a collateral, attack. Here we have the attack made directly. It is the foundation of the action. That such direct attack may be made is also recognized in *Edwards* v. *Moore*, 99 N. C., 1, and *Brittain* v. *Mull*, *Ibid.*, 483.

*Grimes* v. *Taft*, 98 N. C., 193, decides only that purchasers at judicial sales will be protected against the errors and irregularities of the Court and the laches of the parties. Here there was none. The plaintiffs were not parties at all.

In the latest case on the subject, *Harrison* v. *Hargrove*, 109 N. C., 346, the Court held the purchaser protected only by reason of the notice which the complainants had of the purchase of the land and of its long occupation by the purchaser—seventeen years. Here there was no "long delay or unexplained laches on the part of the complainants." It is found as a fact that they had no knowledge of the sale and purchase, nor were they put on notice by possession of the defendant, inasmuch as the defendant was in possession of the land by virtue of the purchase of the dower-right, and after the death of the doweress they moved in apt time to obtain possession. Upon discovery of the defence of the alleged decree and sale they were properly

allowed by the Court to amend this proceeding so as to attack the former proceedings directly and to pray for possession as one of the consequent reliefs asked.

*Morris* v. *Gentry,* 89 N. C., 248, was a case in which the Court appointed a next friend without notice to the infants or the next friend. This was treated as an irregularity, and the purchaser at the sale under the decree without notice of the irregularity was held to have a good title. It will be noted there was an order or judgment of the Court that the infants were parties by such appointment of next friend. There is nothing of the kind in this case as to the adults whose names appear without their authority or any order of Court.

The only direct authority in our Reports that the owner of property can be deprived of it by virtue of the decree of a Court in a cause to which he is not in fact a party or privy and of which he has not notice, is *England* v. *Garner,* 90 N. C., 197. That proceeds upon the argument *ab inconvenienti* of throwing doubt upon judicial proceedings apparently regular. But in such cases we should follow the plain language of the Constitution rather than a decision of a Court, else we would "make the word of no effect by our traditions." But, indeed, exactly the opposite of *England* v. *Garner* is held in *Doyle* v. *Brown,* 72 N. C., 393, which is, besides, supported by the express provisions of both the State and Federal Constitutions, and by the immutable principles of natural justice that property shall not be taken from its owner by virtue of the decree of any Court unless he has opportunity to be heard.

In 1 Freeman on Judgments, sec. 120a, it is said : "Any judgment rendered against one who has neither voluntarily appeared nor been served with process must be treated as void."

In same volume, sec. 117 : " A void judgment is, in legal effect, no judgment. By it no rights are divested. From it no rights can be obtained. Being worthless in itself, all proceedings founded upon it are equally worthless. It neither binds nor bars any one. The purchaser at a sale by virtue of its authority finds himself without title and without redress."

In section 128 the learned author discusses the effect of the unauthorized appearance by attorney, and holds that by the weight of authority a judgment based on that ground can be impeached even collaterally. It would be strange if this were not so since the attorney cannot by acceptance of process bring his recognized client into court. *A fortiori* he cannot by a simple entry on the docket bring in as a party one who is in fact not a client.

As to the argument *ab inconvenienti*, it is true opportunities for fraud may arise if judgments in cases in which parties are apparently regularly in court may be impeached by showing that in fact and in truth they were not parties at all and had no knowledge of the proceedings. But equal or greater frauds will follow if persons can be made parties in proceedings affecting their rights without service of process and be absolutely bound by decrees therein when they are in total ignorance of the pendency of the action. The constitutional guarantee that no one shall be deprived of his property or privileges or liberty, except by the law of the land, protects such persons. Whom else could it protect? What use of the provision unless it applied to such? Mr. Webster, in his argument in the Dartmouth College case, thus defines the " law of the land " and " due process of law," and his definition has often been quoted by the Courts with approval: " The general law, which hears before its condemns; which proceeds upon inquiry, and renders judgment only after trial."

In 2 Freeman on Judgments, sec. 499, the doctrine of the binding effect of the unauthorized appearance of counsel is shown to be repudiated by all of the later cases as subversive of natural justice.

As to Mary J. Smith, who, though an infant, appeared as a party by her general guardian, the proceedings would be binding as to her but for the finding of the jury that the judgment and proceedings were had by fraud of which the defendant had knowledge, for she could look to her guardian if, by his neglect, counsel were not retained. *University* v. *Lassiter,* 83 N. C., 38; *The Code,* §387.

As to the other plaintiffs, never having been made parties, they are not bound by the decree, even in the absence of knowledge by defendant of the fraud.